MICHAEL P. MOORE *vs.* ALFRED S. LIVINGSTON and ELIZA B. his wife.

In cases of the alleged loss of a deed, the law requires the greatest exactitude of proof. It requires incontrovertible evidence of the existence of the instrument; of its execution and delivery, by the subscribing witness; and if there is no subscribing witness, the most satisfactory proof of the genuineness of the grantor's signature.

If the handwriting of the alleged grantor is not sufficiently proved, the mere production of an instrument purporting to be signed by him, and proof of its subsequent loss, can be of no avail to the party claiming under it.

A complaint alleged that on or about Sept. 1, 1845, the defendant Mrs. L., then Miss B., in consideration of the sum of $11,000, conveyed to the plaintiff certain lots of land in the city of New York, with the buildings thereon, and that the deed was duly acknowledged; that the deed remained in the plaintiff's possession more than eight months, when the defendant L. (who had in the meantime married Miss B.) asked permission to look at it; that the plaintiff handed it to him, under a promise that he would return it in a short time; that in October, 1851, L. set up the pretense that the property belonged to his wife; denying that he had ever received a deed from the plaintiff. The plaintiff demanded as relief that the defendants might be directed and decreed to deliver this deed to him, or, in case the same was lost or destroyed, that Mrs. L. might be decreed to execute and deliver a new conveyance of the premises, to the plaintiff. It appeared in evidence that the property in question had previously belonged to the plaintiff; that on the 11th of November, 1844, he conveyed it to D.; and that D. conveyed it to Miss B. June 11, 1845, for the consideration of one dollar, with covenants against his own acts. In order to establish the probability of the conveyance from Miss B. back to the plaintiff, and of which he now sought the redelivery, the plaintiff asserted that his conveyance to D. and D.'s conveyance to Miss B. were fictitious, and for the purpose of protecting the

Moore *v.* Livingston.

plaintiff's property from his creditors. There was no proof that the plaintiff exhibited any interest in the property, until his demand of a reconveyance from Miss B. in 1851, except his alleged statement to others that he had received a deed from her, in September, 1845. D. collected the rents for Miss B.; the lots were improved for her, by L., at a considerable expense; and they were mortgaged by Miss B. two years after the alleged reconveyance, and again five years after such reconveyance. In his examination before the surrogate, in 1844, the plaintiff swore that he sold the property to D. on the 10th or 12th of November in that year; that he had received $10,650 for it, and that there was no understanding between him and D. as to the reconveyance of the premises; and in 1849 he stated to one B. that the sale was *bona fide*, and that Miss B. was the *bona fide* owner of the property. The deed which the plaintiff sought to have delivered up did not purport to have any subscribing witness, and the proof as to the handwriting of the alleged grantor was very slight. The commissioner before whom it was alleged to have been acknowledged had no recollection of the circumstance.

*Held* that in the face of these solemn and positive declarations of the plaintiff, it must be very strong and reliable evidence that would warrant the legal conclusion that he did not make a veritable sale to D., and that Miss B. was not the real owner. And that the allegation that Miss B. did, in consideration of $11,000, convey the property in question to the plaintiff, was not entitled to the benefit of any presumption; but must be strictly and satisfactorily proved, according to the legal rules of evidence.

*Held, also*, that the testimony in the case was not of such force, and so satisfactory, as to justify the court in divesting a person of real property, of which she had been in possession for thirteen years; over which she had exercised independent acts of ownership, during that period; and of which the plaintiff himself, four years after the alleged execution of the conveyance from Miss B., declared that she was the *bona fide* owner.

Judgment rendered at a special term, in favor of the plaintiff, reversed, and a new trial ordered.

APPEAL, by the defendants, from a judgment rendered at a special term. The action was brought under the code of procedure, and was in the nature of a bill in equity. It was commenced April 25th, 1852, against the same defendants, the defendant Mrs. Livingston then being sole. The defendants having thereafter intermarried, an order was made October 24, 1855, directing that the action proceed against them as husband and wife. The defendant Alfred S. Livingston having demurred to the complaint, the demurrer was allowed, and judgment thereupon entered, dismissing the complaint as to him with costs, August 20, 1856. From this time forward

he was not a party in his own right; but only for conformity *qua* husband of the real defendant. The defendant Eliza, then Eliza B. Blackwell, put in an answer. On the issue thus joined, the action was tried by the court without a jury, at special term, March 16, 1857. The decision was in favor of the plaintiff, granting the whole relief claimed. The defendants having taken exceptions and made a case, appealed from the judgment to the general term.

The complaint alleged that on or about September 1, 1845, the defendant Mrs. Livingston, then Eliza B. Blackwell, " in consideration of the sum of $11,000," conveyed to the plaintiff, Dr. M. P. Moore, one equal undivided moiety of two lots of land, one in Courtlandt street and the other in Broadway, in New York. That the deed was duly acknowledged before Dayton Hobart, a commissioner of deeds. That the consideration was " fully settled and adjusted between them previously to" the delivery of the deed. That the deed remained in the possession of Dr. Moore over eight months, " when he was requested by A. S. Livingston permission to look at the said deed," and handed him the deed, " and permitted him to take it with him under his promise to return it in a short time." That A. S. Livingston was then acting as Dr. Moore's agent in care of the premises; that he so acted to the entire satisfaction of Dr. Moore, paying over all rents to him until October, 1851. That A. S. Livingston at this date denied that he had received the deed, refused to return it, and set up the pretense that the property belonged to Miss Blackwell. That the defendants were living together; that A. S. Livingston insists that he is Miss Blackwell's agent in collecting the rents; that Miss Blackwell, when requested to return the deed or execute a new one, declines any answer, but refers to A. S. Livingston. Prayer for a return of the deed, or the execution of a new one, and an account of the rents from July 1, 1851. The answer of Miss Blackwell admits that she claims to own the premises, and also that A. S. Livingston is her agent in collecting the rents thereof. Every thing else

alleged in the complaint is denied. The judge at the trial suggested a doubt whether the answer unequivocally denied the execution of the alleged deed. The defendants' counsel at once moved for leave to amend the answer; but the plaintiff's counsel prevented that step by agreeing that "as a pleading the answer shall be regarded as fully putting in issue the allegations of the complaint as to the execution of any conveyance for all the purposes of this case." The property was described in the pleadings as having once belonged to Dr. Moore. The plaintiff gave in evidence a conveyance thereof, by Elias G. Drake to Miss Blackwell, dated June 11, 1845, for the consideration of one dollar, with covenants against his own acts. The defendants gave in evidence a full covenant warranty deed for the same premises, from Dr. Moore, the plaintiff, to said Elias G. Drake, dated November 11, 1844, in consideration of $10,600. The defendants also gave in evidence the following documentary proofs touching the title and possession of the premises. 1. A mortgage for $10,000, Stephen Price to Henry H. Watson, November 30, 1839. 2. Deed of D. Ullman, master in chancery, on foreclosure of said mortgage, to Lewis Moore, dated May 18, 1841, recorded September 18, 1843; consideration, $6000. 3. Lewis Moore and wife to M. P. Moore, the plaintiff; June 7, 1841; recorded June 21, 1841; consideration, $11,148. 4. Lease by M. P. Moore and William Bradford, (owner of the other half,) for Courtlandt street property to William Burger, at $540 per annum, three years from May 1, 1842, with extension for two years, dated Feb. 11, 1847, signed by the tenant, Bradford, the other owner, and Miss Blackwell. 5. A like lease of north half of the Broadway property to Kimball & Rogers, for five years from May 1, 1842, at $800 per annum, with an extension for two years, dated Feb. 11, 1847, signed by Rogers, one of the tenants, and Miss Blackwell. 6. A like lease of south half of the Broadway property to J. G. Bolen for three years from May 1, 1842, at $650 per annum, with an extension for two years, signed by the tenant and Elias G. Drake; and another exten-

Moore *v.* Livingston.

sion for two years at $600 per annum, dated Feb. 11, 1847, signed by the tenant and Miss Blackwell. It appeared that Miss Blackwell was one of a family of that name consisting of one brother and five sisters; that A. S. Livingston, at the earliest period referred to in the proofs, was the husband of one of the sisters named Justina; that she died September 11, 1851, and that in 1854 he married her sister Eliza, the defendant. In 1840 or 1841 and onward to 1844, Justina Blackwell and her husband, A. S. Livingston, Harriet Blackwell and her husband Mr. Bleecker, Rosina Blackwell, Julia Blackwell and Eliza Blackwell, the defendant, all then unmarried, resided together as one family, in a house in Hubert street, New York. Afterwards A. S. Livingston, his wife Justina and the defendand Eliza boarded together for some time in Hudson street, New York. Afterwards they traveled together for a short time. After that period until Justina's death, the last named three persons lived together, first in Third street, New York, and then at Trenton, N. J. During all this period Dr. Moore was on very intimate and friendly terms with A. S. Livingston and the ladies. He boarded in the same house with them in Hudson street, and traveled with them, and was their family physician. At the time of the trial, only three of the sisters were living. Mrs. McDonald, one of them, was examined as a witness. Drake, the purchaser, collected the rents of the premises in question from August 1, 1845, (the first quarter after his purchase,) until August, 1847, first in his own name, afterwards as agent for Miss Blackwell. After that time A. S. Livingston collected the rents as agent for Miss Blackwell. No act of Dr. Moore was shown after the date of his deed to Drake, in connection with the property or indicating any care for or interest therein until his demand for a reconveyance in 1851 or 1852. In the years 1849–50 the two lots were improved upon at a cost of about $14,000. Mr. Bradford, son and agent of the other co-owner, made the payments, receiving one half from A. S. Livingston. Miss Blackwell mortgaged the Courtlandt street property to C. Lawson for $2000, Nov.

23, 1847, and mortgaged the Broadway property to C. H. Marshall for $5000, June 7, 1850.

The plaintiff produced *Thomas F. Conry, Thomas Seaman, Geo. L. Pride*, and his brother, *Charles Moore*, as witnesses to certain matters, tending, as he conceived, to the conclusion that such a deed as that alleged in the complaint had been in his possession about the year 1845. Except the delivery of a certain letter written by himself to Miss Blackwell, which was not answered, the contents of which were received under objection, he gave no evidence accounting for the non-production of the supposed deed. The oral testimony of each of said four witnesses, touching the existence and contents of the supposed deed not produced or accounted for, was objected to for that reason. The objection was in each instance overruled, and the decision excepted to. Mr. Dayton Hobart was also examined for the plaintiff; but he gave no material evidence. After all the plaintiff's *four* witnesses had been examined, and just before resting the case, Dr. Moore was himself offered as a witness " to prove the allegations in the complaint, about the manner in which the alleged deed to plaintiff was procured from him by A. S. Livingston, and to account for its loss," " not as a witness in chief, but to account for the non-production of the deed." The defendants objected to the reception of this evidence, on the ground that the inferior testimony had all been admitted without it, and because A. S. Livingston could not be heard to contradict the plaintiff as a witness for his wife, and the complaint showed that Mrs. Livingston had no personal knowledge of the fact in question, and consequently she could not avail herself of 2 *R. S.* 406, § 74. (*See Revisers' Note*, 3 *R. S.* 738, 2*d ed.*) The defendants, also, in support of their objection to this evidence, offered to waive expressly in writing any objection to other evidence founded on the non-production of the deed. The court, nevertheless, admitted the witness to testify, and the defendants excepted. Dr. Moore testified that he once had a paper *purporting*, &c., as alleged in complaint, and

that he last saw it in the hands of A. S. Livingston, and did not at time of trial know where it was. Dr. Moore then offered himself as a witness in chief, with liberty to both defendants to become witnesses in contradiction to him. The offer was not accepted. The plaintiff then .called the attention of the court to the fact, that the description in the complaint showed that Dr. Moore once owned the property, gave in evidence the deed from Drake to Miss Blackwell, and rested his case. Dayton Hobart testified that ten or twelve years prior to the trial, (say in 1845, 6 or 7,) he took the acknowledgment of Miss Blackwell to some instrument, at her residence in Hudson street, N. Y. He could recollect nothing more about the paper. He could recollect but one instance. He had a sort of vague impression that he might have taken her acknowledgment three or four times. The defendants produced a power of attorney from Miss Blackwell to S. C. Williams, witnessed by and acknowledged before this witness, December 7, 1844. John F. Conry, a witness for the plaintiff, testified that ten or twelve years before the trial, Dr. Moore called on witness to get a loan on real estate, and showed him a deed purporting to be signed and sealed by Eliza B. Blackwell ; that Dr. Moore told him it was not recorded, and that he examined for and found upon it no indorsement of registry. It was not shown or pretended that this witness knew Miss Blackwell, or her handwriting ; and each question to him, and each answer by him, was objected to by defendants. Each objection was overruled, and the defendants excepted. Thomas Seaman gave essentially the like testimony, fixing the time more exactly, September, 1845. He did not know Miss Blackwell or her handwriting. The plaintiff's conversations with him were allowed, under exception. Every part of his direct testimony was excepted to. His cross-examination tended very strongly to discredit his statement. George L. Pride gave the like testimony, with, *perhaps,* one additional fact. He testified that he remembered the name of Hobart to the acknowledgment. He said that

he did not know his handwriting; took it for granted; he was not *then* acquainted with Mr. Hobart's handwriting to know it, to swear to it. He had not intimated that he had ever seen Mr. Hobart's writing, or knew him at all, or knew any thing of him; and the counsel for the plaintiff, in the face of an exception, was allowed to ask whether, from his "then knowledge of the character of Mr. Hobart's handwriting, he believed that to be his signature?" He answered affirmatively. He was cross-examined at length. He could not recollect how the name of Hobart was written, whether abbreviated or at length. He did not recollect reading the acknowledgment; he took it for granted. Did not scrutinize it. While under cross-examination he volunteered this statement: "I had seen Mr. Hobart write two or three times before that, when I had acknowledged deeds before him." This led to fuller cross-examination, when he declined to swear that he had so acknowledged any deed or paper before Mr. Hobart, or seen him write. He thought it was a deed of trust; looked at it but slightly; was rather attending to what Dr. Moore said, than looking at the deed. It was a hasty interview. He did not recollect the signer's christian name; nor whether or not Dr. Moore's signature was appended. Did not afterwards recur to this circumstance; and but for a recent conversation with Dr. Moore, would not have recollected the names as well as he did. The interview at which he saw the paper was at Dr. Moore's office, in Hudson street, about 11 o'clock in the morning. Dr. Moore called him in. At first he thought he could tell; but at last he failed in telling where he had been that morning, what his business had been, or whither he was going. He could give no fact, through which his story might be tested by contact with other witnesses. He had several real estate transactions during his life; he had bought and sold. He described the various instances; but he could not remember the name of any witness or commissioner to any of his deeds; had forgotten the names of some of his grantors, and had an imperfect recollec-

tion of others. He had only seen Dr. Moore two or three times, and had only a bowing acquaintance with him; and never had but two conversations with him. One was when he saw the deed, the other was the year before. Could not tell who introduced them.

Charles Moore, a brother of plaintiff, testified that, about 11 A. M., one morning, in September, 1845, he had an inter-view with Dr. Moore in his bed room, *a back room in the second story of* Mrs. Newport's boarding house in Hudson street. That Dr. Moore then took from his coat pocket a deed conveying the premises in question to him, purporting to be signed by Miss Blackwell. That he had often been with his brother in that room. That he had no special occasion for calling on this occasion; the interview might have lasted two or three hours. This witness was about 19 years of age at the time referred to. He had been previously examined conditionally in the cause in 1852, and located this interview *in the parlor.* On the trial he was cross-examined to this point, and could not remember whether or not he had so testified; but he insisted, however that might be, that it in fact took place in the second story back room. Mrs. Newport, her sister-in-law, and her son were produced by the defendants, and united in testifying that Dr. Moore's bed room was a front room on the third story, and that while living in that house he never occupied any other room.

C. Moore said that there was no attesting witness. Mr. Hobart testified that it was his habit to see that there was an attesting witness, or to attest as such himself. He admitted that he did not scrutinize the signature; but said that he knew Miss Blackwell's handwriting, and that the signature to the deed was her's. He was fully cross-examined as to his knowledge of her handwriting. After stating that he saw her write a number of times, he retreated to *two occasions.* They were both about the same time in 1843, and no person present on either occasion was living at the time of the trial. The two occasions were as follows : He was in the habit of

visiting at the residence of the Blackwell family in Hubert street, New York, for a couple of years ; had paid twelve to twenty visits. Once, without any known occasion, during one of witness' evening visits, Miss Blackwell took a pen, and wrote her name on a blank sheet two or three times. No one else was present. She said nothing ; did not ask witness to look at it. The other occasion was in the evening, when playing a game called *consequences.* She then wrote with a pen and ink. He had frequently played that game at that house ; but could name no living person with whom he had played it, except Miss Eliza B. Blackwell. Alex. N. Bleecker, who married Harriet Blackwell, one of the sisters, testified for the defendants that he understood the game called *consequences;* that if a lady showed a gentleman what she wrote, it would spoil the game. In playing it, one could not see what others wrote. That a pencil is used ; pen and ink never ; it would be very inconvenient. That he never knew it played by Miss Blackwell, or in the Blackwell family. The only surviving sister who was able to attend, and the brother, testified that they never knew the game played in the family, or by the defendant Eliza. C. Moore, at first, named his employer at the time of this occurrence ; but afterwards said that he could not remember where he was then employed. He testified that A. S. Livingston superintended the rebuilding for Dr. Moore. He had been a witness for Dr. Moore in his various controversies, and was his expected devisee. He testified that one of the things written in this game of consequences was the name of Mr. Brantingham. Mr. Brantingham testified that he never visited at the house in Hubert street, and his acquaintance with Miss Blackwell commenced subsequently to her leaving that house. In 1852 he went to the house in Trenton, N. J.; and there had an interview with Miss Blackwell, in the presence of A. S. Livingston. He told her he came, at Dr. Moore's request, with some papers, to induce her to convey the property back ; that he had a deed ready, and she had nothing to do but to

Moore *v.* Livingston.

sign it. She said he must speak to Alfred ; but he continued to speak to her ; Livingston became very angry, ordered him to withdraw ; and he did so, under an apprehension of being kicked out. He handed to, and left with her, a letter from Dr. Moore ; he showed her certain depositions to read ; she wept. He told her she knew very well why the property was put in her hands ; that she knew very well she had never paid any thing for it, and was bound to return it to Dr. Moore. She said she would do nothing in the matter. Nothing was said about the previous reconveyance, now alleged. It did not appear that Miss Blackwell opened, or read the letter. Under the defendants' exception, the court admitted it in evidence. It alleges, in substance, that Dr. Moore's conveyance was in trust for himself ; and that A. S. Livingston had destroyed a reconveyance executed by Miss Blackwell.

The plaintiff rested. The defendant gave the following evidence. *First.* The title papers before mentioned, other than the deed to Miss Blackwell, which the plaintiff had produced. *Secondly.* A complaint of Dr. Moore, in an action for medical services and money expended, brought against Miss Blackwell, April 22, 1852, claiming on oath $3900. A like complaint, of same date, against A. S. Livingston, for $14,760. *Thirdly.* An examination of Dr. Moore, the plaintiff, on oath, before the surrogate of New York, November 29, 1844, in which he expressly testified that the sale to Drake was without any understanding for a reconveyance, and was for the price or consideration of $10,650 received by him. *Fourthly.* Elias G. Drake, the purchaser, testified that he bought from Dr. Moore at the request of A. S. Livingston, and paid him for the property with funds provided by A. S. Livingston. One item was Livingston's check for $500. As far as he knew, it was an out and out *bona fide* sale. His intervention was procured to avoid suspicion that it was not an actual sale, Moore and Livingston being very intimate. At the request of Mrs. Justina Livingston, for whom he un-

derstood the purchase to have been made, he executed the conveyance to Miss Blackwell. *Fifthly*. Thomas W. Brantingham testified that, in February or March, 1849, in a free and friendly conversation, Dr. Moore told him that his sale of the premises was *bona fide*, and that Miss Blackwell was *bona fide* owner of the property. In cross-examining the defendants' witnesses, the plaintiff sought to show that Miss Blackwell had not sufficient means to pay for the property when it was conveyed to Drake.

The defendants having rested, the plaintiff was allowed to give in evidence, by a bank clerk, a bank account of A. S. Livingston, as kept in 1844, in the Mechanics' Banking Association. The admission of this testimony was excepted to. The plaintiff then offered the examination and cross-examination of A. S. Livingston, as a witness, on the indictment of Dr. Moore, in February, 1857. The court admitted it, and the defendants excepted. The examination contained the most full and explicit declaration ; 1st, that the sale to Drake was *bona fide* and for full value. 2dly, that the full consideration was furnished to Drake by Livingston for the purpose, and, as the witness believed, paid over by Drake to Moore ; that Livingston never knew of, or had in his possession, any reconveyance to Moore.

The judge at special term found that the conveyance by Dr. Moore to Drake was made without consideration, with intent to hinder, delay and defraud Dr. Moore's creditors. Also that a reconveyance to Dr. Moore was executed by Miss Blackwell about Sept. 1845 ; and that such deed was in possession of A. S. Livingston ; that it was "mysteriously obtained" and "fraudulently withheld." And the court decided that the defendants should execute a deed to the plaintiff, and that the tenants should attorn. The defendants excepted. The defendants made a case containing the evidence, with their exceptions, in order to review the questions of law and fact.

Moore *v.* Livingston.

*Mortimer Porter* and *C. O'Conor*, for the appellants.

*F. G. Young* and *James T. Brady*, for the respondent.

*By the Court,* CLERKE, J. However singular may be the circumstances presented at the trial under consideration, the same measure and rules of evidence must be applied to it, as if it were an ordinary case. If a deviation from this course were permitted, because criminal or dishonorable conduct, on the part of any of the litigants, was disclosed in the controversy, we should be constantly constrained to disregard the principles which the law prescribes ; and, I apprehend, the rules would become exceptions, and exceptions the rules. For it is the sad result of judicial experience, that the majority of litigated actions originate in some transgression of moral duty, or some breach of sacred honor, calculated to enlist our sympathies, or to excite our detestation.

In the case before us the complaint alleges, that on or about 1st September, 1845, the defendant Mrs. Livingston, then Eliza B. Blackwell, in consideration of the sum of $11,000, conveyed to the plaintiff one equal undivided moiety of two lots of land, with the buildings, &c. thereon, one in Courtlandt street, and the other in Broadway in this city, and that the deed was duly acknowledged before Dayton Hobart, a commissioner of deeds. It further alleges, that the deed remained in the possession of the plaintiff more than eight months, when Alfred S. Livingston, one of the defendants, asked permission to look at it; that the plaintiff handed it to him, under a promise that he would return it in a short time. It alleges that Livingston acted at this time as Moore's agent in the management of the premises, and that he continued to act in that capacity, collecting and paying over the rents to the plaintiff, and acting to his entire satisfaction until the month of October, 1851, when Livingston set up the pretense, that the property in question belonged to the said Eliza B. Blackwell, denying that he had ever received a deed from the plaintiff.

The plaintiff demands as relief in this action, that the defendants and each of them may be directed and decreed to deliver this deed to him, and in case the same be lost or destroyed, that the defendant Eliza B. Blackwell may be decreed to execute and deliver a new conveyance of the said premises to the plaintiff.

Is there any measure of legal evidence presented in this case, upon which a court of justice can safely act, to prove that Eliza B. Blackwell executed, acknowledged and delivered to the plaintiff this deed of conveyance? It appears that the property in question had previously belonged to the plaintiff; that on the 11th of November, 1844, he conveyed it to Elias G. Drake; and that Drake conveyed it to Miss Blackwell, June 11, 1845, for the consideration of one dollar, with covenants against his own acts. But, in order to establish the probability of the conveyance from Miss Blackwell back to the plaintiff, and of which he now demands the redelivery, the plaintiff asserts that his conveyance to Drake, and Drake's conveyance to Miss Blackwell were fictitious, merely for the purpose of protecting the plaintiff's property from some possible impending legal assault.

It may be well, first to consider the evidence upon which this latter assertion is founded. Drake, to whom the plaintiff conveyed, testifies to the delivery of the conveyance to him, to his payment of $500 on account, before he got the deed, to the delivery of the deed at the office of Archibald Rogers, the plaintiff's attorney, to the payment by him of the balance of the consideration money on the receipt of the instrument, in the presence of the plaintiff, and to his execution of a conveyance of the same property to Miss Blackwell, dated June 11, 1845, at the request of Mrs. Justina Livingston, the former wife of the defendant Alfred S. Livingston; for whom it is alleged by Livingston, it was purchased in trust by Drake. Drake testifies that it was given as the reason for his taking the title, that the plaintiff was in some legal difficulty; and from the great intimacy which existed between Dr. Moore and

Moore *v.* Livingston.

Livingston, it would look more like a real sale if he took the title. Livingston, he says, gave him the check for the $500, and that afterwards, (after the payment of this sum on account, and before the delivery of the deed,) Livingston gave him the balance of the money, in checks and bills; whose checks he could not tell. Livingston handed him money and checks; "he could not tell how much in money; some of the checks he thought were Livingston's; did not know whose checks the rest were; could not tell the number of the checks." The amount paid by him, when he received the deed, was $10,150; which, with the $500 previously paid, made up the amount of the consideration money mentioned in the instrument. Drake further testified in answer to a question by defendants' counsel, asking him to state all that Mr. Livingston had said, when he first introduced the subject of his (Drake's) taking the title, that Livingston told him he was about to sail for Europe; he afterwards changed to the West Indies; "he said that some person had a property to sell, and he or some of his family, or his wife, or sister, wished to buy it; I don't remember which; and on account of his great intimacy with the owner, and of the owner being in difficulties, he did not wish to take the title in his own name." He further testified, that neither Moore nor Livingston, in any of the conversations, said any thing to the contrary of its being an absolute *bona fide* sale from Moore to the person for whom they were purchasing; that he had no knowledge or intimation that Moore was to have any interest in it after he conveyed to him; and that during all the time he was collecting rents, down to August, 1847, Moore never called on him to talk about the rent.

This is the only testimony in the whole case capable of throwing any light on the precise nature of the circumstances relative to the conveyance from Moore to Drake; and this testimony was introduced by the defendants. Strange to say, neither party called Rogers, Moore's attorney, or Williams, from whom Livingston declared he had received a portion of

the consideration money. But as Livingston, in his testimony in the court of sessions, which the judge at special term thought proper to admit, asserted that the transaction was *bona fide*, that his sister-in-law had bought it from Moore at his (Livingston's) solicitation, and that he had obtained a part of the money with which to make the purchase from Mr. Williams, who was the agent of the Blackwell estate, and who had money in his hands belonging to that estate, it was assuredly very natural that the plaintiff should have procured his attendance as a witness; and as the burthen of proof rested on him, it is still stranger that he did not secure the testimony of his attorney, Mr. Rogers.

The only evidence in the case on this point, reaching beyond mere surmise or conjecture, having any tendency to corroborate the plaintiff's allegation, is the state of Livingston's account in the Mechanics' Banking Association at the time of the purchase, and the payment of a check on the Bank of New York, dated 12th November, 1846, for $500, payable to Alfred S. Livingston or bearer, signed by the plaintiff. It undoubtedly appears from his account with the Mechanics' Bank aforesaid, that Livingston had not money in that particular place, at the time, to pay for this property. But he did not, at any time, pretend to derive it from this source; it is disclosed that there were other sources, from which it is not at all improbable he might have obtained the money. His wife and his sister were each entitled to from $15,000 to $20,000 out of the Blackwell estate, and it would not be at all extraordinary if Mr. Williams, the agent of that estate, advanced to Mr. Livingston some portion at least of the amount necessary to effect what he might have represented as a good purchase, and which subsequent circumstances proved to be a correct representation; and the very fact that the purchase was made, at least apparently, for Miss Blackwell, seems still more not only to show that the money was obtained from the Blackwell estate, but that the transaction was not of the character alleged by the plaintiff. For, if the conveyance was made for this purpose,

it would have sufficiently answered that purpose to have it conveyed in trust to Drake for Livingston himself, instead of his wife, or his sister-in-law ; indeed, considering the circumstances and the unbounded confidence which the plaintiff declares he placed in Livingston at the time, it would have been safer to have the conveyance made to him than to his sister-in-law, who was a lady of some fortune, young, and therefore not likely to have the same control over it as a man, who was his own master, and who, Dr. Moore thought, was his devoted friend.

There is no proof that the plaintiff exhibited any interest in this property, until his demand from Miss Blackwell for a reconveyance, in 1851, except his alleged statement to his brother and others that he had received a deed from her in September, 1845.   Drake collected the rents for Miss Blackwell; the lots were improved at a considerable expense by Livingston for her ; they were twice mortgaged by Miss Blackwell, one mortgage being to secure $2000, the other $5000 ; one given in 1847, two years, the other in 1850, five years after the alleged reconveyance.

When we consider in addition to these circumstances, and the absolute failure of proof on the part of the plaintiff, in reference to the conveyance to Drake, his own sworn affidavit before the surrogate, and his admission to Brantingham, I can see nothing to justify the belief that the transaction was fictitious.   In his examination before the surrogate on 29th Nov. 1844, he swears that he sold this property to Elias G. Drake, on the 10th or 12th of that present month ; that he had received $10,650 for it, and that there was no understanding between him and Mr. Drake as to the reconveyance of the premises ; and to Brantingham he says, in February or March, 1849, that the sale was *bona fide*, and that Miss Blackwell was the *bona fide* owner of the property.   It must be very strong and reliable evidence, indeed, that would warrant the legal conclusion that he did not make a veritable sale to Drake, and that Miss Blackwell was not the real owner, in the face of

these solemn and positive declarations. But the evidence is not strong or reliable; if there is any thing that deserves the name of evidence on that point, it is very weak and unreliable. No ground of probability is, therefore, left for the main allegation of the complaint, that Miss Blackwell did, on or about the 1st Sept. 1845, in consideration of the sum of $11,000, convey to the plaintiff one equal undivided moiety of the property in question; the proof of it must rest upon other circumstances, and other evidence, direct or indirect. This allegation is not, I maintain, as the case stands upon the point we have been considering, to have the benefit of any presumption; the allegation must be strictly and satisfactorily proved, according to the legal rules of evidence.

In addition to the plaintiff's own evidence, which the defendant, now Mrs. Livingston, had no opportunity to refute by her own testimony, we have no evidence that amounts to any thing, not actually conjectural or very dim, except that of Charles Moore, the brother of the plaintiff.

Is his testimony of such force, and so satisfactory, as to justify the court to divest a person of real property of which she has been in possession for thirteen years; over which she has exercised independent acts of ownership during that period; and of which the plaintiff himself, four years after the alleged execution of the conveyance from Miss Blackwell, declared that she was the *bona fide* owner ?

The chief importance of the testimony of this witness depends upon what he says in relation to the handwriting of Miss Blackwell; because if that handwriting is not sufficiently proved, the mere production by the plaintiff of an instrument, purporting to be signed by her, can be of no avail. If it can, no man's estate is secure for a day. It is only necessary for any one, determined to get possession of it, to prepare a deed purporting to be executed by the owner, to show it, at a convenient season, to any friend, and then to allege its loss. Fortunately, the law, in cases of alleged loss, requires the greatest exactitude of proof. It requires incontrovertible evi-

dence of the existence of the instrument; of its execution and delivery, by the subscribing witness, and, if there is none, the most satisfactory proof of the genuineness of the grantor's signature. This witness is sure he saw Miss Blackwell write twice; once when she was playing, with several others in the room, the game called consequences, in which "ladies and gentlemen all unite, and pass the same sheet from one to another; they write a word, the name of a place or a person, and pass the paper round." What the *consequences* are, the witness does not inform us; nor does he give us any explanation of the game. But he does not state that, on the occasion referred to, Miss Blackwell wrote her *name;* if she wrote any other name, or any other word, while engaged in an evening pastime, it would be scarcely sufficient to afford the witness an adequate opportunity to become acquainted positively with her signature; and it moreover appears, by the subsequent testimony of Mr. Bleecker, who was a member of the family at the time this game was performed at their house, that if a lady showed a gentleman what she wrote, it spoiled the game. On the only other occasion on which the witness states decidedly that he saw Miss Blackwell write, he says she wrote her name. She wrote her name two or three times; "there was no special cause or occasion for it; she wrote with pen and ink on paper; it was left on the table." He does not distinctly recollect seeing her write at any other time; though during his visits at this period he thinks he saw her write three times in all. Now certainly, without imputing any improper or intentional bias to the witness, it seems very clear that it would be unsafe, in the highest sense of that word, to consider this sufficient proof of the execution of an instrument of the most solemn and of the highest nature, known, with the exception of a record, to our law. But when we find that these visits occurred in December, 1843, and January, 1844, and that the alleged deed must have been shown to him by the plaintiff some time after the 1st of September, 1845, the date of its alleged execution, and that during this interval of nearly two

years, the witness never saw Miss Blackwell write, our confidence in the sufficiency of his testimony for so serious a purpose, can scarcely be expected.    We cannot also overlook the fact, that three or four of the persons who were members of the family at the time these visits occurred, testify that " they never knew the game played in the family, or by the defendant Eliza."    Mr. Dayton Hobart, before whom the plaintiff says Miss Blackwell acknowledged the execution of this deed, has no recollection whatever of it ; ten or twelve years prior to the trial, he took her acknowledgment to *some* instrument, at her residence in Hudson street.    He could recollect distinctly only one instance ; although he was personally acquainted with her very well ; he may have taken others ; he had a sort of vague recollection of having taken her acknowledgment three or four times.    The defendants produced a power of attorney from Miss Blackwell to S. C. Williams, witnessed by and acknowledged before him.    He states his uniform practice is to subscribe his name as a witness, where there is no other name subscribed as such.    The alleged deed had, it is admitted, no witness.    This certainly does not supply any deficiencies in the testimony of Charles Moore, who, as I have said, is the only witness brought to substantiate this grave and important claim, whose evidence is worthy of any consideration.    Can we sustain the judgment of the special term on such evidence as this ?

When, in addition to the intrinsic weakness of the plaintiff's proofs, we consider the circumstances accompanying the transactions connected with the disposition of this property, from the conveyance to Drake to the demand in 1851, we can no longer hesitate.

I have already referred to the plaintiff's sworn examination before the surrogate, and to his declaration to Brantingham, four years after the alleged execution of the deed, that Miss Blackwell was the *bona fide* owner of the property.    But there are other acts and declarations, on his part, equally significant.    He swears in his complaint that the defendant

Eliza B. Blackwell, (now Mrs. Livingston,) conveyed this property to him in consideration of the sum of $11,000; whereas the whole theory of his case rests on the assumption that she had held it in trust for him, and was, therefore, entitled to no price for it. In April, 1852, he commenced an action against Miss Blackwell for medical services, claiming on oath $3900; and, for a similar cause, an action against Mr. Livingston, the other defendant, for $14,760, likewise on oath.

It cannot fail to strike us as singular that the plaintiff never had this alleged deed recorded; for it is fairly to be presumed, if he sought and procured the reconveyance of this property in 1845, that the reasons which had induced him to make a fictitious disposal of it had ceased to exist; if they continued to exist, all his trouble, all the annoyances to which this proceeding exposed him, and the false, not to say dangerous, position in which it placed him, were all fruitless; and there is no suggestion whatever that he obtained this reconveyance in consequence of any waning confidence in the fidelity of Miss Blackwell or Mr. Livingston. On the contrary, his intimacy was undiminished, and he left the whole control of the property in their hands. But one of the most unaccountable of the plaintiff's inconsistencies is, that, although he handed this reconveyance back to Livingston, in June, 1846, at the request of the latter, who merely said he wanted to look at it; and that he then permitted him to take it with him, under his promise to return it *in a short time,* he allowed Livingston to retain it, without making any demand for it, until October, 1851; and consented also, notwithstanding this palpable and suspicious violation of his promise, that he should continue the manager of this property, receiving all its rents, and in 1849 and 1850 laying out large sums in its improvement; in fact, erecting new buildings conjointly with the other owner, Mr. Bradford, on both lots. And all this time, during this heavy expenditure, the plaintiff was never known to exhibit the least interest in the

concern.　Mr. Bradford had nothing to do with him; he was not seen in the affair.

To say that the plaintiff, when he conveyed this property to Drake, never expected, at some future period, to receive it back, on repayment of the consideration money, or that the defendant Livingston never pledged himself to have it reconveyed, would be saying what may or not be true.　The court has nothing to do with surmises or conjectures suggested by this "strange," and to the principal parties to this controversy, "eventful history."　It is very manifest that there is most audacious and most dishonorable perfidy somewhere; but our sphere of action, as a court of justice, is limited to proofs prescribed by law; we could not, even if we had just, moral reasons, which we have not, for fixing the guilt upon the unworthy party, express any opinion, or institute any action upon it.

All that we are bound to say is, that the plaintiff has not legally proved his case; that the decision of the special term is against the weight of evidence; and that, therefore, its judgment should be reversed, with costs, and a new trial be ordered.

Having passed upon the whole case, independently of the evidence excepted to by the defendant's counsel, I have not thought it necessary to express any direct opinion upon the rulings of the judge in relation to that portion of the evidence.

[NEW YORK GENERAL TERM, November 4, 1858. *Davies, Clerke* and *Sutherland,* Justices.]